## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

**KELLEY G. LOUD, Successor Trustee** )
**of the bankruptcy estate of Blakelyn** )
**Kit Dawson and Joshua Steven Dawson** )
**(23-80943 EDOK),** )
)
)
)
)
)
)
Plaintiff, )
)
v. )        **Case No. CIV-21-359-RAW**
)
**DEAN JACKSON, CINDY AKARD,** )
**ARTIE COLE, SHERMAN HAMILTON,** )
**JULIE FODGE, ASHLEY HAWKINS,** )
**and ANTHONY ECHELLE,** )
)
)
)
)
)
Defendants. )

### <u>ORDER</u>

Before the court are the motion of defendants Jackson, Cole, and Hamilton and the

motion of defendants Akard, Fodge, Hawkins, and Echelle to dismiss.  In the second

amended complaint (#59), original plaintiff Joshua Dawson ("Dawson")[1] alleges he began

working at the Oklahoma Department of Transportation ("ODOT") on June 4, 2019 and he

---

[1]Dawson has subsequently filed for bankruptcy (#60), and the
bankruptcy trustee substituted as plaintiff.

was constructively discharged on June 22, 2020. He alleges he was subjected to pervasive racial discrimination by his supervisors and coworkers.[2]  He alleges that his complaints to his employer's Human Resources office were wholly ignored.  He alleges he was forced to resign and move his family to a new town to protect himself and his family from pervasive racial discrimination, threats of violence, and stalking.  Specifically, he brings claims for racial discrimination, hostile work environment, and retaliation.

Under Rule 12(b)(6), the court must assume the truth of plaintiff's well-pleaded facts and draw all reasonable inferences from them in the light most favorable to plaintiff. *Western Watershed Project v. Michael,* 869 F.3d 1189, 1193 (10th Cir.2017).  To overcome a motion to dismiss, a complaint must plead facts sufficient to state a claim to relief that is plausible on its face.  *Sylvia v. Wisler,* 875 F.3d 1307, 1313 (10th Cir.2017).  A claim is facially plausible if the plaintiff has pled factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*  The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2) F.R.Cv.P. depends on the type of case. *Robbins v. Oklahoma,* 519 F.3d 1242, 1248 (10th Cir.2008).  In a case against multiple defendants, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations. . . ." *Id.* at 1250

---

[2]He alleges he was the only black employee in his department and all of ODOT's Atoka County offices.

(emphasis in original).

Rule 8(a)(2) F.R.Cv.P. still lives. Under Rule 8, specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir.2012). While the Rule 12(b)(6) standard does not require that plaintiff establish a prima facie case in his complaint, the elements of each cause of action help to determine whether plaintiff has set forth a plausible claim. *Id.* at 1192.

In this case, the movants have also asserted the defense of qualified immunity. "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Myers v. Baxter,* 773 Fed.Appx. 1032, 1036 (10th Cir.2019). At the motion to dismiss stage, however, defendants are subject "to a more challenging standard of review than would apply" at the summary judgment stage. *Id.*

"At the motion to dismiss stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Id.* (emphasis in original). When a defendant raises a qualified immunity defense in a Rule 12(b)(6) motion, the court must dismiss the action unless the plaintiff shows that (1) that the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation. *A.N. by & through Ponder v. Syling,* 928 F.3d 1191, 1196 (10th Cir.2019). Courts have discretion to decide which qualified immunity prong to consider first. *Pearson v.*

*Callahan,* 555 U.S. 223, 236 (2009). In one motion, movants assert the court need only

address the first prong. (#62 at page 33 of 35 in CM/ECF pagination).[3] A finding of

qualified immunity predicated on the first prong is equivalent to a decision on the merits of

the claim. *See Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 783 (10th Cir.1993).

Plaintiff's first claim for relief, asserted against all defendants, is for violation of 42

U.S.C. §1981, with plaintiff seeking redress pursuant to 42 U.S.C. §1983.[4] The second

claim for relief, asserted against defendants Jackson, Hamilton, Akard, Fodge, Hawkins, and

Echelle, is for a violation of the Equal Protection Clause pursuant to 42 U.S.C. §1983. The

third claim for relief, (asserted against all defendants *see infra*) , is for retaliation pursuant

to 42 U.S.C. §1981. The fourth claim for relief, asserted against all defendants, is for hostile

work environment pursuant to 42 U.S.C. §§1981 and 1983, and the Equal Protection Clause.

The second amended complaint alleges multiple claims against multiple defendants.

Therefore, the allegations against each defendant will be discussed in turn. Plaintiff's first

claim is for racial discrimination and harassment, ultimately resulting in plaintiff's

constructive discharge. **Defendant Jackson** is alleged to have been ODOT Superintendent

---

[3]In any event, plaintiff "has a clearly established right to
be free from racial discrimination in the workplace." *Pryor v.
Univ. of Utah,* 2024 WL 4393348, *7 (D.Utah 2024)(citing *Ramirez
v. Dep't of Corr.,* 222 F.3d 1238, 1243-44 (10th Cir.2000)).
Thus, the second prong is satisfied.

[4]Section 1983 provides "the exclusive federal . . . remedy
for the violation of the rights guaranteed by §1981 when the
claim is pressed against a state actor." *Jett v. Dall. Indep.
Sch. Dist.,* 491 U.S. 701, 735 (1989).

at all relevant times. (#59 at ¶2). During plaintiff's first day, Jackson instructed employees to "shovel curbs." Plaintiff was told (by co-workers, not Jackson) that the reason for the directive was to see if plaintiff would work. (¶14).

Jackson told plaintiff that Jackson had been asked what it was like "working with the black guy." (¶16). Jackson assigned plaintiff to the most undesirable tasks. (¶17) Jackson told plaintiff that Jackson had something plaintiff would like. Upon walking outside, plaintiff learned it was a watermelon. (¶24). Defendant Hamilton saw a black cow and said "I found one of [plaintiff's] uncles." Hamilton later repeated the joke to "Jackson's approval." (¶25).

Jackson was "a constant source of discriminatory behavior to the Plaintiff." (¶30). Whenever plaintiff tried to speak with Jackson, the latter would bring up plaintiff's race. Jackson often joked to plaintiff "you're okay – for a white guy." (¶30). Once when plaintiff brought his complaints of racism to Jackson, the latter sharpened a knife, pointed it at plaintiff, telling plaintiff "you need to toughen up, my son-in-law is Oklahoma Highway Patrol, if I want to find anything out about you let's just say I have my ways." Plaintiff felt threatened and intimidated. (¶31)

"These things" would occur on a regular basis and Jackson "made it clear" he would not listen to plaintiff's complaints. (¶32) Jackson took no steps to investigate or rectify plaintiff's complaints against defendants Hamilton and Cole, and participated in the complained-of racial hostility. (¶32). Plaintiff alleges, upon information and belief, that Jackson told defendant Hamilton about plaintiff's complaints of racial harassment. (¶33).

After plaintiff reached out to defendant Akard (ODOT Human Resources Manager), the harassment and discrimination by defendants Jackson, Hamilton and Cole increased in frequency and severity.  (¶36).

When plaintiff was seeking to speak to defendant Akard, Jackson stated "I just find it funny how one of my guys talks to personnel so much." (¶39).   It was clear to plaintiff that Jackson had been made aware of plaintiff's previous complaints to human resources and that Jackson disliked the fact that plaintiff was attempting to resolve these problems through HR. (¶39).   Akard told plaintiff to talk to Jackson about the situation.  (¶40).   Plaintiff requested a transfer, but Jackson replied he would not sign off on it.   (¶41)   After expressly complaining about co-worker Cole, plaintiff alleges Jackson scheduled plaintiff to work with Cole for weeks.  Plaintiff interpreted this as retaliation for his complaint.  (¶41).

At the time of his alleged constructive discharge, plaintiff was on COVID-related leave.   Jackson "made it clear" he did not believe employees should be allowed to take COVID leave (¶43).  He also stated "you're just like the rest of the lazy blacks that lay up and get welfare." (¶44).

On one occasion (evidently while plaintiff was on COVID-related leave) plaintiff passed Jackson heading west in Antlers.   Jackson made a quick U-turn and got behind plaintiff.  Plaintiff began making turns in an attempt to lose Jackson, but Jackson followed him for some turns.  (¶46).  On another occasion during plaintiff's COVID-related leave, plaintiff noticed Jackson in his ODOT pickup sitting at the edge of plaintiff's driveway.  As

6

plaintiff walked toward his driveway, Jackson saw plaintiff and sped away. (¶47).

Plaintiff alleges he feared for his life and the lives of his children, based on Jackson's overtly racist comments and his sharpening of the knife. Plaintiff alleges his fear was so deeply rooted that he made the decision to move away from Atoka to protect his family and children. (¶48). Because of these incidents and the constant discrimination plaintiff faced, he alleges he no longer felt safe returning to work from his COVID-related leave to continue working at ODOT. Plaintiff alleges he had no choice but to resign, and was constructively discharged on June 22, 2020. (¶49).

**Defendant Cole** is alleged to have been a coworker of plaintiff and trainer. (¶4). On plaintiff's first day on the job, he was instructed by Cole to drive the backhoe. Plaintiff had not completed his backhoe training and had a near miss with traffic. Defendant Hamilton became upset with plaintiff and told him he had no business operating the backhoe since he had not completed his training. Plaintiff told Hamilton that Cole had instructed plaintiff to drive the backhoe. Hamilton laughed and said "you gotta watch him." (¶15).

Plaintiff's co-workers (including Cole and Hamilton) racially discriminated against plaintiff, made racist comments, purposefully misdirected plaintiff how to complete tasks, harassed plaintiff, set plaintiff up to fail, and assigned plaintiff to the most undesirable tasks. (¶17). Cole once told plaintiff "if I wanted to look like you, all I have to do is paint my face black," (¶23). The incident regarding Jackson sharpening a knife and pointing it at plaintiff arose from plaintiff complaining to Jackson about Hamilton and Cole. (¶31). After plaintiff

reached out to defendant Akard, the harassment and discrimination by Jackson, Hamilton, and Cole increased in frequency and severity. (¶36).

On mowing assignments, Cole left plaintiff the most dangerous sections to mow. (¶37). After speaking with Jackson about Cole, plaintiff was scheduled to work with Cole for weeks, allegedly in retaliation for making the complaint. Plaintiff felt that this was an attempt to punish him or make him miserable for voicing his concern. (¶41).

**Defendant Hamilton** was the ODOT Road Supervisor (¶5). As previously stated, he allegedly laughed at Cole directing plaintiff to operate the backhoe. (¶15). He told plaintiff that the east side of Atoka, Oklahoma was called "nigger town" and plaintiff "should ride through and turn [his] music up." (¶21). While working, Hamilton once yelled "woah nigger!" and then turned to plaintiff and said "If you ever put a case on me, I'll figure out a way to get you back." (¶22). Plaintiff once set a cup of coffee on the back of a flatbed truck and left to retrieve his lunch box. When plaintiff returned, someone had placed a cup of poison weed killer in a similar cup next to plaintiff's coffee cup. Plaintiff poured the contents of both cups on the ground. Hamilton laughed and said "you're a smart man. I wondered how long it would take you to catch it." (¶26).

On multiple occasions, Hamilton did not allow plaintiff to drive an ODOT vehicle to the closest gas station to use the restroom like all other employees. Plaintiff was forced to relieve himself outside, on the side of the road, and in public view. (¶27). While taking a break, Hamilton referred to a woman as "no good now. I seen her walking in nigger town

8

the other day." (¶28). In the Fall of 2019, Hamilton asked plaintiff if he brought chicken for lunch. Plaintiff replied no. As plaintiff ate his lunch with a pickle, Hamilton said "Josh, I hate to sit and watch you eat that pickle with that kinky hair and them big ol' gorilla lips." (¶29).

Hamilton (and several other named defendants) discriminated against plaintiff based on his race through the encouragement, ratification and approval of discriminatory acts and the violations of policies, practices, and/or customs. (¶78). Plaintiff engaged in protected opposition to discrimination when he complained of his treatment to Jackson and others. (¶81). This resulted in defendants Jackson, Hamilton, and Cole increasing the harassment (¶83), ultimately resulting in plaintiff's constructive discharge. (¶84).

Hamilton treated plaintiff differently than his similarly-situated Caucasian co-workers by harassing plaintiff because of his race, including constant racial comments to plaintiff, threats of violence, intentionally placing plaintiff in harm's way, and attempting poisoning. (¶¶59, 71, 92).[5]

**Defendant Akard** is alleged to have been ODOT Human Resources Manger at all relevant times. (¶3). She was responsible for ensuring non-discriminatory work policies with respect to ODOT employees. (¶3). Regarding the various work incidents, Akard told plaintiff "not to make a big deal out of it." (¶35).

Akard told plaintiff she would see what she could do regarding transfer from Atoka

---

[5] *See also* ¶91 (all defendants).

County, but that plaintiff was not the first person to complain  (¶34).  Plaintiff was never

offered a transfer.  Akard never investigated or took any action to address plaintiff's

complaints.  (¶35)  She again told plaintiff "not to make a big deal out of the situation" and

told him to talk to Jackson about it.  (¶40).  Plaintiff continued to report his concerns to

Akard over harassment and request a transfer.  (¶42)

**Defendant Fodge** was a supervisor over plaintiff and defendants Cole, Jackson, and

Hamilton.  (¶¶62, 74).  Plaintiff spoke to Fodge about what was taking place in Jackson's

unit.  (¶38).  Plaintiff reiterated his desire to be transferred, but no action was taken.  Fodge

did nothing to address the conduct of defendants Jackson, Cole and Hamilton. (¶38).  Fodge

"supervised" Jackson but plaintiff's reports of harassment were "to no avail."  (¶42).  Fodge

was aware of past and widespread complaints of African Americans being treated disparately

on the basis of race by Jackson, Cole, and Hamilton, like those of plaintiff.  (¶¶77, 85, 98).

Fodge was responsible for enforcing ODOT policies regarding racial discrimination and

wholly failed and refused to act on plaintiff's complaints, thereby treating plaintiff differently

than his similarly-situated Caucasian coworkers.  (¶¶62, 74, 95).

Fodge took no steps to follow ODOT policy and only refused to act because of

plaintiff's race.  (¶¶62, 74).  Fodge discriminated against plaintiff by his continued

encouragement, ratification and approval of discriminatory acts and the violations of policies,

practices, and/or customs.  (¶78).  Fodge, Akard, Hawkins and Echelle retaliated against

plaintiff making complaints by refusing to enforce policies against discrimination and

denying plaintiff a transfer. (¶86). The ignoring of plaintiff's complaints by Fodge, Echelle, Hawkins, and Akard because of his disparate treatment and request for transfer left plaintiff no reasonable choice but to resign his position. (¶65).

**Defendant Hawkins** was Deputy Division Engineer for ODOT (¶6). Plaintiff spoke to Hawkins regarding what was taking place in Jackson's unit. Hawkins did nothing to address the alleged conduct, and failed to investigate or intervene and took no action to provide plaintiff the requested transfer. (¶38). Hawkins was a supervisor over plaintiff and Cole, Jackson, and Hamilton. (¶¶63,75,96). He was responsible for ensuring non-discriminatory work policies regarding ODOT employees and was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of ODOT.

Hawkins failed and refused to act and thereby treated plaintiff differently than his similarly-situated Caucasian co-workers. Hawkins only refused to act because of plaintiff's race. (¶¶63,75,96). A combination of factors, including Hawkins's ignoring plaintiff's complaints and refusal of transfer left plaintiff no reasonable choice but to resign. (¶65). Hawkins was aware of past and widespread complaints of African Americans being treated disparately on the basis of race, like those of plaintiff. (¶¶77, 85, 98).

Plaintiff engaged in protected opposition to discrimination when he complained to Hawkins. (¶81). Hawkins retaliated against plaintiff making complaints by refusing to enforce policies against discrimination and denying plaintiff's transfer request. (¶86).

**Defendant Echelle**[6] was at all relevant times the Division Engineer for ODOT and was responsible for ensuring non-discriminatory work policies. He was responsible for creating, adopting, approving, ratifying, and enforcing, the rules, regulations, and policies of ODOT employment. (¶7). Plaintiff spoke to Echelle about his complaints but no investigation or intervention took place. (¶38). Plaintiff requested a transfer to no avail. (¶42). Echelle treated plaintiff differently than his similarlly-situated Caucasian coworkers by wholly failig and refusing to act on plaintiff's complaints. Echelle only refused to act because of plaintiff's race. (¶¶64, 76). Echelle was aware of past and widespread complaints of African Americans being treated disparately on the basis of race, like those of plaintiff. (¶77). Echelle (along with Jackson, Hamilton, Akard, Fodge, and Hawkins) through his continued encouragement, ratification, and approval of discriminatory acts and the violation of policies, practices, and/or customs, have discriminated against plaintiff based on his race by treating him differently than non-African American counterparts, including Cole and other ODOT employees. (¶78).

Echelle was aware of past and widespread complaints of African Americans being treating disparately on the basis of race, like those of plaintiff. (¶¶85, 98). Echelle retaliated against plaintiff making complaints by refusing to enforce policies against discrimination and denying plaintiff's transfer. (¶86). Echelle treated plaintiff differently than his similarly-

---

[6]In the heading of the second amended complaint, this name is spelled "Echelle." In the body of the second amended complaint, the name is spelled "Echellie."

situated Caucasian coworkers by wholly failing and refusing to act on plaintiff's complaints and refusing to consider a transfer. Echelle took no steps to follow ODOT policy, and only refused to act because of plaintiff's race. (¶97).

The court elects to discuss the fourth claim first, because constructive discharge is usually closely linked to alleged hostile work environment. *See, e..g, Gomez v. Okmulgee Co. Crim. Justice Auth.,* 2023 WL 4999861, *6 (E.D.Okla.2023)("Since Plaintiff has failed to state a claim of a hostile work environment, he has also failed to state a claim of constructive discharge."); *Penn. State Police v. Suders,* 542 U.S. 129, 146-47 (2004).

To allege a plausible claim under a hostile work environment theory, a plaintiff must allege facts suggesting that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Gomez,* at *5. A plaintiff must allege facts showing that the work environment is both subjectively and objectively hostile or abusive under this standard. *Brown v. LaFerry's LP Gas Co., Inc.,* 708 Fed. Appx. 518, 520 (10th Cir.2017). To meet the objective portion of this test, the alleged harassment must be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances. *Id.* at 520-21.

In the court's view, the essential difficulty for plaintiff is as described in *Raspardo v. Carlone,* 770 F.3d 97 (2d Cir.2014): "This case demonstrates how hostile work environment claims that may readily be brought against employers under Title VII do not always fit easily

13

within the context of <u>individual</u> <u>liability</u> under §1983." *Id.* at 114 (emphasis added). Thus, "when a plaintiff alleges that multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment, each defendant is only liable under §1983 when his <u>own</u> <u>actions</u> are <u>independently</u> sufficient to create a hostile work environment." *Id.* at 115 (emphasis added).[7]

This analysis is not contrary to Tenth Circuit precedent. *See Henry v. Storey,* 658 F.3d 1235, 1241 (10th Cir.2011)("But §1983 imposes liability for a defendant's own actions – personal participation in the specific constitutional violation complained of is essential."). In other words, the usual analysis (under Title VII for example) takes account of the <u>totality</u> of the circumstances and even the overall work environment. *See Givens v. City of Wichita,* 2024 WL 1198503, *17 (D.Kan.2024). By contrast, a challenge to a §1983 claim requires the court to consider "whether Plaintiffs have alleged facts against <u>each</u> <u>individual</u> defendant that plausibly allege a hostile work environment for purposes of the §1983 claims." *Pfannenstiel v. Kansas,* 2022 WL 873674, *13 (D.Kan.2022)(emphasis added).

As in the case at bar, "[h]ere, there are no allegations that the individual defendants coordinated or planned acts of harassment. Rather, the individual defendants are alleged to have engaged in uncoordinated acts of harassment, or else acquiesced to or were deliberately

---

[7]Defendants make essentially the same argument but do not cite the *Raspardo* decision.

14

indifferent to acts of harassment by others." *Id.*[8]  The court in *Pfannenstiel* concluded "the Court finds that the non-conclusory allegations are generally insufficient to plausibly allege that any of the individual defendants are individually liable for creating a hostile work environment, with one exception discussed below." *Id.* This court reaches the same conclusion, but with no exception.

One paragraph (#59 at ¶91) is a collective allegation against "Defendants" and thus does not meet the Tenth Circuit pleading standard.  Also, the hierarchy of employees is not made perfectly clear.  Cole is the only employee merely described as a co-worker (¶89). Hamilton is described as being "in a supervisory role" over plaintiff and Cole.  (¶92). Jackson is described as being "in a supervisory role over Plaintiff and Defendants Hamilton and Cole."  (¶93).  Fodge, Hawkins and Echelle are each described as being a supervisor "over Plaintiff and Defendants Cole, Jackson, and Hamilton."  (¶¶95, 96, 97).  The allegations against Akard, Hawkins, and Echelle as to hostile work environment deal solely with their alleged failure to enforce anti-discrimination and safety policies in the workplace, and refusing to consider a transfer for plaintiff.  Hamilton (¶92) and Jackson (¶93) are alleged to have failed to enforce policies <u>and</u> engaged in harassing conduct themselves.

"Individual liability under §1983 in hostile work environment claims may . . . .involve supervisory liability." *Raspardo,* 770 F.3d at 116.  Plaintiff must show that the supervisor

---

[8]Plaintiff contends that he does make some allegations of coordination, (#72 at 6) but these are only as to Cole, Jackson, and Hamilton, and are largely subjective and conclusory.

actually knew of and acquiesced in the harassment. *Murrell v. School District Number 1, Denver, Colorado,* 186 F.3d 1238, 1250 (10th Cir.1999). That is, a defendant may not be held liable merely because of his or her supervisory position. *Gerovic v. City and County of Denver,* 2020 WL 6281483, *9 (D.Colo.2020)(citation omitted). Section 1983 does not authorize liability under a theory of *respondeat superior*, i.e., vicarious liability. *Id.* (citation omitted). For this reason, the Supreme Court has suggested the term "supervisory liability" is "a misnomer." Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009)).

A plaintiff therefore must show an "affirmative link" between the supervisor and the constitutional violation. *Id.* (citation omitted). This requires, for example, more than "a supervisor's mere knowledge of his subordinate's conduct." Id. (citation omitted). Instead, a plaintiff must show three elements to hold a defendant liable under §1983 based on his or her supervisory responsibilities: (1) personal involvement, (2) causation, and (3) state of mind. *Id.* As to causation, a plaintiff must establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights. *Schneider v. City of Grand Junction Police Dept.,* 717 F.3d 760, 768 (10th Cir.2013)(citation omitted). The element of causation is a factual matter which would usually await a motion for summary judgment. In the case at bar (as to the claim of hostile work environment) the

court finds it is determinative even in the context of a motion to dismiss.

In the second amended complaint, there are more allegations regarding supervisory duties than actual improper conduct. As to allegations of allegedly harassing conduct, the court concludes (viewing the allegations separately as to each defendant) plaintiff has failed to allege a plausible claim that the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment.[9] Some of the specific incidents are reprehensible but boorish, juvenile or annoying behavior or a few isolated incidents are insufficient. *Throupe v. Univ. of Denver,* 988 F.3d 1243, 1252 (10th Cir.2021). Considering the allegations as a whole – as in a Title VII case – the court might (or might not) find a plausible claim of hostile work environment, but that is not this case.

As to allegations about supervisors failing to enforce policy, "[c]ourts routinely hold that the failure to prevent harassment is insufficient to demonstrate the personal involvement necessary for individual liability under §1981." *Bethea v. First Citizens Bank & Trust Co.,* 2023 WL 6639774, *11 (D.S.C.2023)(citing cases). As a matter of logic, if the allegedly harassing <u>conduct</u> does not rise to the level of creating a hostile work environment, a supervisor's enforcement or non-enforcement of policy would not contribute to any such creation. Moreover, again as opposed to a Title VII case, it would have to be alleged that a particular supervisor's handling of policy contributed to a specific defendant's creation of

---

[9]In the incident in which Jackson allegedly pointed a knife at plaintiff, it was accompanied by a statement of a non-physical "threat", regarding Jackson's son-in-law.

17

a hostile work environment.

Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. *Bennett v. Windstream Commc'ns, Inc.,* 702 F.3d 1261, 1269 (10th Cir.2015). While whether a constructive discharge occurred is a question of fact for the jury, *Strickland v. United Parcel Serv., Inc.,* 555 F.3d 1224, 1228 (10th Cir.2009), this principle assumes plaintiff's pleading is sufficient to reach that point. (In an earlier order in this case, the court noted that if the plaintiff's resignation is voluntary, he may not claim constructive discharge. This is correct, but is also a factual issue and begs the question at the pleading stage). In sum, the pending motions are granted as to the fourth claim for relief.

Plaintiff's third cause of action alleged against all defendants[10] is for retaliation. Generally, a plaintiff must allege: (1) he engaged in protected activity, (2) the defendant took adverse action against him, and (3) a causal relationship between the protected activity and the adverse action. *Lindsay v. Denver Public Schools,* 88 F.4th 1323, 1327 (10th Cir.2023).

Plaintiff alleges that he engaged in protected opposition to discrimination when he complained on multiple occasions to defendants Jackson, Akard, Fodge, Hawkins, and Echelle (¶81). He alleges that after such protected activity, adverse employment action was taken by Jackson, Hamilton and Cole. (¶83). He again asserts a constructive discharge

---

[10]Defendants Cole and Akard are not mentioned in the heading of the third claim for relief, but are mentioned in the allegations. (¶¶83,85 & 86).

18

based on Jackson and Hamilton's conduct. (¶84). He alleges adverse actions by Akard, Fodge, Hawkins, and Echelle in refusing to enforce anti-discrimination policies and the denial of plaintiff's requested transfer. (¶86).

The supervisor-defendants assert the following "failures" in these allegations: plaintiff does not indicate what <u>sort</u> of transfer he requested or whether his requested new location had an open position, he does not indicate who and when and what made him think his request was denied, and how he "knows" these defendants had a retaliatory motive. (#74 at 4).

Defendants Jackson and Hamilton also contend that "Plaintiff provides insufficient details regarding the timing of the alleged reporting of discrimination and transfer request and insufficient details about when and how **each** Defendant allegedly retaliated to establish a plausible retaliatory motive." (#62 at page 25 of 35 in CM/ECF pagination)(emphasis in original).

The court disagrees. Rule 8(a)(2) F.R.Cv.P. does not require plaintiff to present a "diary-like" account of dates and times in his complaint. Those may be inquired into during the discovery process. As previously stated, plaintiff alleges increased discrimination by Jackson and Hamilton <u>after</u> his protected activity. (¶83). There is an implicit "after" in alleging that Akard, Fodge, Hawkins, and Echelle retaliated having been made aware of widespread complaints. (¶¶85 & 86).

In the context of a retaliation claim, the definition of constructive discharge differs

somewhat. A constructive discharge occurs when a reasonable person in the employee's position would view his working conditions as intolerable and would feel that he had no other choice but to quit. *Tran v. Trustees of State Colleges,* 355 F.3d 1263, 1270 (10th Cir.2004). An objective test is applied, under which neither the employee's subjective views of the situation nor the employer's subjective intent with regard to discharging him, are relevant. *Id.*

Once again, the court finds that plaintiff has failed to allege a plausible claim of constructive discharge. Even accepting well-pled allegations as true and viewing them in the light most favorable to plaintiff, he has failed to allege that each defendant (or indeed any single defendant) created intolerable working conditions through his or her conduct. In a Title VII case, the alleged conduct could be combined and viewed as a totality. In a §1983 case, individualized scrutiny is required. The pending motions are granted as to the constructive discharge aspect of the third cause of action. The remainder of the third cause of action survives the pending motions.

Plaintiff's first cause of action (against all defendants) is for disparate treatment in that plaintiff was allegedly treated "differently than similarly-situated Caucasian employees with regard to racial harassment, creating a violent and unsafe working environment, refusing to act on Plaintiff's complaints, and refusing a transfer." (¶66). Once again, plaintiff alleges this resulted in a constructive discharge. (¶65).

In racial discrimination suits, the elements of a plaintiff's case are the same whether

20

that case is brought under §§1981 or 1983 or Title VII. *Bradley v. Unified Govt. of Wyandotte County/Kansas City, Kansas,* 2024 WL 3890142, *8 (D.Kan.2024)(footnote omitted). To establish a prima facie case of race discrimination under §1981, a plaintiff must show (1) membership in a protected class; (2) adverse employment action, and (3) disparate treatment among similarly situated employees. *Id.* (footnote omitted). An adverse employment action need not cause significant, material, or serious injury to be actionable, but there must be some disadvantageous change in an employment term or condition. *Id.* (footnote omitted).[11]

Movants direct most of their fire at plaintiff's claim that the disparate treatment resulted in a constructive discharge. Again, the court agrees for the reasons previously stated. The allegations viewed as to each defendant do not state a plausible claim that the conduct of any one defendant created the conditions required for a constructive discharge. That aspect of the first cause of action will be dismissed.

Aside from constructive discharge, the first cause of action will not be dismissed. The court finds the allegations, even viewed as to each defendant in isolation, are sufficient to make out a plausible claim as to each defendant. A fuller accounting of which each defendant did or did not do will be developed in the discovery process. The determination

---

[11]The court in *Bradley* said that additionally the plaintiff bears the burden of showing that race was a but-for cause of his injury. *Id.* (footnote omitted). The court was reviewing a motion for summary judgment, however. Causation is not an element of a prima facie case to be analyzed regarding a motion to dismiss.

of what constitutes an adverse employment action has evidently been altered. *See Muldrow v. City of St. Louis, Mo.,* 601 U.S. 346 (2024). Plaintiff need not show "substantial" harm, so long as he makes a plausible claim that he was "treated worse" because of a protected characteristic. *Id.* at 355.[12] Especially if, as it appears, the bar has been lowered in this regard, this court declines to find that no defendant engaged in adverse employment action as to plaintiff in the context of a Rule 12(b)(6) motion. Dismissal of a claim for constructive discharge no doubt alters plaintiff's damages calculation. Still, at a minimum, nominal damages might ultimately be awarded. *See Manzanares v. City of Albuquerque,* 628 F.3d 1237, 1241-43 (10th Cir.2010).

Finally, in the second cause of action, (against defendants Jackson, Hamilton, Akard, Fodge, Hawkins, and Echelle) plaintiff again alleges discrimination, but frames it as an equal protection claim. Race discrimination by a state actor can constitute a violation of the Equal Protection Clause. *See Poolaw v. City of Anadarko, Okla.,* 660 F.2d 459, 462 (10th Cir.1981). This claim does not contain an allegation of constructive discharge.

As to each named defendant, plaintiff makes the accusation that the defendant "treated Plaintiff differently than his similarly-situated Caucasian co-workers" through his or her conduct. As to supervisors, this includes allegations of actual knowledge and acquiescence. Under the applicable pleading standard, the court finds these allegations sufficient to survive

_____

[12]The Supreme Court in *Muldrow* reached its result based on the statutory language of Title VII. Its applicability to cases under §1981 or §1983 has not yet been definitively resolved.

the pending 12(b)(6) motions. One motion (#61) argues there are no allegations as to "racial animus" on the part of movants. Under the applicable pleading standard, the court finds an inference of animus can reasonably be drawn. Of course, this issue can be revisited should motions for summary judgment be filed.

Necessarily, (under authority cited earlier in this order) the court finds plaintiff has met his burden as to the surviving claims regarding defendants' assertion of qualified immunity.

At the conclusion of both responses to the pending motions, plaintiff states that if the court needs further detail he requests an opportunity to amend the complaint again. Such a request in a response, rather than a separate motion, is contrary to Rule 7(b)(1) F.R.Cv.P. and Local Civil Rule 7.1(b). *See Gomez,* 2023 WL 4999861, *7 (E.D.Okla.2023). Plaintiff's counsel has not taken to heart (1) the court's statement that "the chances of the court granting leave to file a <u>third</u> amended complaint are vanishingly small." (#58 at 3) and (2) the court's previous citation to *Shed v. Oklahoma Dep't of Humans Servs.,* 729 Fed.Appx. 653, 658 (10th Cir.2018): "The purpose of motion practice under Rule 12(b)(6) . . . is not for the court to 'identify' pleading deficiencies as to each defendant, with such deficiencies to be 'corrected' by serial amendments."

It is the order of the court that the motion to dismiss of defendants Akard, Fodge, Hawkins, and Echelle (#61) and the motion to dismiss of defendants Jackson, Cole, and Hamilton (#62) are hereby granted in part and denied in part. The fourth claim for relief in the second amended complaint (#59) is dismissed. The first, second and third claims for relief remain pending, with the exception of any claim for constructive discharge.

**IT IS SO ORDERED** this 10th day of MARCH, 2025.

_____

**RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**